USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/23/17

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**ATLAS MF MEZZANINE BORROWER, LLC, a
Delaware limited liability company,**

                    Plaintiff,

          - against –

**MACQUARIE TEXAS LOAN HOLDER, LLC, a
Delaware limited liability company,**

                    Defendant.

17 Civ. 1138 (LLS)

**OPINION & ORDER**

          Plaintiff Atlas MF Mezzanine Borrower, LLC ("Atlas"),

moves, under Fed. R. Civ. P. 65(a) and N.Y. U.C.C. § 9-625(a),

for a preliminary injunction against defendant Macquarie Texas

Loan Holder, LLC ("Macquarie"), to prevent Macquarie from

selling on Monday, February 27, 2017 Atlas's equity interest in

Atlas MF Holdco, LLC ("Holdco"), a subsidiary of Atlas, that Atlas

pledged as collateral to secure a loan from Macquarie.

          For the reasons that follow, the motion is denied.

                    **BACKGROUND**

          The following facts appear uncontroverted:

          Atlas, its parent company, and affiliate companies, develop

and operate multi-family housing. Ver. Compl. (Dkt. No. 1) ¶ 18.

In or around December of 2013, Atlas, through its wholly owned

subsidiary Holdco, purchased eleven apartment complexes located

in the State of Texas. Id. ¶¶ 19, 21, 24. Each purchase was

financed by a separate loan insured by the United States

                         1

Department of Housing and Urban Development ("HUD"). Id. ¶ 19. The purchase of the apartment complexes was financed through a mezzanine loan that Atlas obtained from Macquarie in the sum of $71 million. Id. ¶ 28; Jones Decl. (Dkt. No. 18) ¶ 13. The terms of the loan were memorialized in a mezzanine loan agreement and a promissory note executed by Atlas and Macquarie and dated December 30, 2013. Ver. Compl. ¶ 29, Exhs. A-B; Jones Decl. ¶ 16, Exhs. C-D. In a pledge and security agreement executed the same day, Atlas pledged its equity interest in Holdco and other collateral as security for the mezzanine loan. Ver. Compl. ¶ 31, Exh. C.; Jones Decl. ¶ 17, Exh. E. Under the mezzanine loan agreement, the loan was to mature on January 2, 2017, but because that day was a public holiday, the agreement provided that final payment was due on the preceding business day, which was December 30, 2016. See Ver. Compl. ¶ 30, Exh. A; Jones Decl. ¶ 20, Exh. C. The loan documents set forth certain conditions under which Atlas could extend the maturity date for two one-year periods. See Ver. Compl. ¶ 30, Jones Decl. ¶ 19. According to Macquarie's president Hayden Jones, at the time the loan matured Atlas had not met the conditions to extend the maturity date, and Atlas did not request an extension of the maturity date. Jones Decl. ¶ 19.

As the maturity date approached Atlas sought financing to enable it to pay off the balance of the mezzanine loan. Ver.

Compl. ¶ 33. On December 22, 2016 Atlas asked Macquarie to forebear for a short period from exercising its rights and remedies, informing Macquarie it would be able to pay the loan in full within 45 days of the maturity date, and Macquarie indicated its openness to a short period of forbearance. Ver. Compl. ¶¶ 35-37; Jones Decl. ¶ 21. Atlas and Macquarie agreed that neither party's rights and remedies were waived by the negotiation over the forbearance agreement. Jones Decl. ¶ 22, Exh. B. Macquarie sent two draft forbearance agreements on December 28 and 30, 2016, but Atlas refused to agree to either of them, claiming that they contained provisions that violated HUD regulations, and other provisions that are not customary in such agreements. Ver. Compl. ¶¶ 37-42; Jones Decl. ¶¶ 22-24.

Atlas claims that "Macquarie purposefully led Atlas to believe that a forbearance would be granted, only so that Atlas would allow the Maturity Date to pass, so that Macquarie could then declare the Mezzanine Loan to be in default." Ver. Compl. ¶ 53.

Atlas did not pay the loan balance before the December 30, 2016 maturity date. Jones Decl. ¶ 25.

On January 3, 2017, Macquarie sent Atlas a notice of default and demand for payment. Ver. Compl. ¶ 42, Exh. D; Jones Decl. ¶ 25, Exh. F. On the following day Macquarie sent Atlas an updated notice of default. Jones Decl. ¶ 26, Exh. G.

On January 11, 2017 Macquarie sent Atlas notice that it would hold a sale, under New York's Uniform Commercial Code, of Atlas's interest in Holdco and the other collateral on February 27, 2017. Ver. Compl. ¶ 44, Exh. E; Jones Decl. ¶ 27, Exh. H.

Macquarie hired CBRE Capital Advisors, Inc. ("CBRE"), a licensed auctioneer, to commence the marketing and conduct the sale of Atlas's interest in Holdco and the other collateral. Jones Decl. ¶¶ 29, 36. CBRE sent marketing documents to approximately 8,400 investors in the multifamily property industry who have purchased properties similar to the eleven apartment complexes and together with Macquarie posted approximately 189 documents concerning Atlas, Holdco, and the apartment complexes to an online data site on January 12, 2017. Id. ¶¶ 30-31. Prospective bidders can access the online data site after executing a confidentiality agreement available from CBRE. Id. ¶ 33. A form sale agreement was posted to the online data site on January 18, 2017, and a revised version of the form agreement was posted to the site on February 6, 2017. Id. ¶ 32. According to Mr. Jones, 69 prospective bidders have executed confidentiality agreements and gained access to the online data site. Id. ¶ 34.

A "UCC Public Sale Notice" advertising the date, time, and location of the sale was published in the Real Estate Alert on February 15, 2017 and in the Wall Street Journal beginning on

4

February 17, 2017 and continuing to run each publishing day through February 25, 2017. Id. ¶ 35, Exhs. I-J.

As a result of Macquarie declaring the mezzanine loan in default, Atlas's lender refused to go forward with refinancing the loan. Ver. Compl. ¶ 47. Atlas maintains that it is finalizing a new refinancing loan with a different lender that will enable it to pay off the mezzanine loan in full within 60 days. Ver. Compl. ¶ 48; Ivankovich Decl. (Dkt. No. 22-1) ¶ 3.

Atlas claims that the terms of the scheduled sale are not commercially reasonable and therefore violate N.Y. U.C.C. § 9-610(b). See Memo (Dkt. No. 6) at 1. Alternatively, Atlas claims that Macquarie should be precluded from purchasing the collateral at the sale because the scheduled sale is not a "public disposition" under N.Y. U.C.C. § 9-610(c)(1).

On February 14, 2017 Atlas filed a complaint against Macquarie, and on the same day moved for a preliminary injunction to stop Macquarie from selling Holdco pending the outcome of this action, or, in the alternative, to stop Macquarie from purchasing Holdco for itself at the sale. The parties submitted papers supporting and opposing the motion, and a hearing was held on February 22, 2017.

## DISCUSSION

Jurisdiction exists under 28 U.S.C. § 1332(a)(2) because, as pleaded, Atlas is a citizen of Illinois and Macquarie is a

5

citizen of a foreign state, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

A party seeking a preliminary injunction must demonstrate "(1) that he or she will suffer irreparable harm absent injunctive relief, and (2) either (a) that he or she is likely to succeed on the merits, or (b) that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, and that the balance of hardships tips decidedly in favor of the moving party." Moore v. Consol. Edison Co. of N.Y., Inc., 409 F.3d 506, 510 (2d Cir. 2005). A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Id.

## Irreparable Harm

"[I]rreparable injury is one that cannot be redressed through a monetary award. Where money damages are adequate compensation a preliminary injunction should not issue." Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 427 (2d Cir. 2004). "It is not sufficient for a movant to demonstrate the mere possibility of irreparable harm; the movant must show that it is likely to suffer irreparable harm if equitable relief is denied." Worldwide Diamond Trademarks, Ltd. v. Blue Nile, Inc., 14 Civ. 3521 (VSB), 2014 WL 7933941, at *3 (S.D.N.Y. Nov. 6, 2014), citing JSG Trading Corp. v. Tray-Wrap, Inc., 917 F.2d 75,

6

79 (2d Cir. 1990).

Atlas argues that because Holdco's underlying assets are real property which the law deems unique, its injury in losing Holdco cannot be adequately compensated by monetary damages. Memo at 21. However, what is being sold here is Atlas's equity interest in Holdco. Where a "Plaintiff's interest in the real estate is commercial, and the harm it fears is the loss of its investment, as opposed to loss of its home or a unique piece of property in which it has an unquantifiable interest," such losses "are ordinarily compensable by damages, and do not necessarily amount to an irreparable harm as a matter of law." SK Greenwich LLC v. W-D Grp. (2006) LP, 10 Civ. 7846 (RPP), 2010 WL 4140445, at *3 (S.D.N.Y. Oct. 21, 2010).

The First Department went further, affirming the denial of a preliminary injunction in a case similar to this one, holding:

> Since plaintiffs' interest in the real estate is commercial, and the harm they fear is the loss of their investment, as opposed to loss of their home or a unique piece of property in which they have an unquantifiable interest, they can be compensated by damages and therefore cannot demonstrate irreparable harm.

Broadway 500 W. Monroe Mezz II LLC v. Transwestern Mezzanine Realty Partners II, LLC, 80 A.D.3d 483, 484, 915 N.Y.S.2d 248, 249 (1st Dep't 2011), citing SK Greenwich, 2010 WL 4140445, at *3 (alterations and quotation marks omitted).

The Second Department held similarly, in reversing a preliminary injunction order, that:

7

Since the plaintiff does not reside in any of the subject apartments, and his interest in the apartments is commercial, involving only the potential loss of his investment, as opposed to the loss of his home or a unique piece of property in which he has an unquantifiable interest, he failed to show that he would sustain irreparable harm absent a preliminary injunction."

Lombard v. Station Sq. Inn Apts. Corp., 94 A.D.3d 717, 721, 942

N.Y.S.2d 116, 121 (2d Dep't 2012), citing Broadway 500, supra.

Atlas also argues that the monetary damages it will suffer from losing the eleven properties "could not be measured with any reasonable degree of certainty." Memo at 22. But as the First Department held in Broadway 500: "Plaintiffs maintain that it would be impossible to quantify the future value of the revenue stream and waterfall from the Property. However, even lost profits that are difficult to ascertain can be compensated by money damages." Broadway 500, 80 A.D.3d at 484, 915 N.Y.S.2d at 249 (quotation marks and citation omitted).

Atlas claims that if the sale goes through it will suffer reputational harm which cannot be quantified and for which it cannot be adequately compensated with monetary damages, but that is speculative.

Because Atlas has failed to demonstrate irreparable injury that cannot be redressed through a monetary award, it cannot obtain a preliminary injunction.

### Likelihood of Success on the Merits

Atlas argues that it is likely to succeed on the merits because the terms of the sale are not commercially reasonable as

8

required by N.Y. U.C.C. § 9-610(b). Atlas points to specific terms in the sale that it claims render the sale commercially unreasonable. Memo at 24.

Atlas claims that "No potential bidder could possibly conduct due diligence on the $100 million asset that is the subject of sale by the sale date." Id. But the February 27, 2017 sale date was set by January 11, 2017, information about the sale was sent by CBRE to thousands of multifamily property investors on January 12, 2017, and Macquarie and CBRE made 189 documents concerning the sale available on the online data site on January 12, 2017, more than six weeks before the sale date.

Additionally, notice of the sale was published in the Real Estate Alert on February 15, 2017 and in the Wall Street Journal starting February 17, 2017 and is scheduled to run each publishing day through February 25, 2017. On this score § 10(d)(v) of the pledge and security agreement requires only that, "The notice of the date, time, and location of the foreclosure sale is published in the . . . Wall Street Journal . . . for seven (7) consecutive days prior to the date of the foreclosure sale." Ver. Compl., Exh. C.; Jones Decl., Exh. E.

Also, Macquarie notified Atlas of the sale of its collateral on January 11, 2017, which is reasonable under N.Y. U.C.C. § 9-612(b).

Atlas claims that "The terms of the sale can be changed on

9

the date of the sale without prior notice to the potential bidders, rendering meaningless all of the assumptions on which the bidders prepared their bids." Memo at 24. But Atlas fails to demonstrate that is commercially unreasonable: reasons beyond Macquarie's control can cause the sale to be cancelled at the last minute, for example if Atlas exercised its right of redemption prior to the sale, or a court enjoined the sale.

Atlas claims that "The $100 million asset that is the subject of the sale is subject to governing documents which bidders will not be permitted to see in advance, even though Macquarie could easily provide the governing documents." Id. In fact a form sale agreement was posted to the online data site on January 18, 2017 and a revised version of the form sale agreement was posted to the site on February 6, 2017. Atlas argues that the form agreement is a draft subject to change, but Macquarie has committed that "it's the form that will be used" and "this is a sale contract that Macquarie has prepared to use" and it is merely protecting its ability to make changes in the event "that the borrower wants to make some changes . . . that may be negotiated at the end." Transcript of hearing Feb. 22, 2017, 23:5-9.

Atlas argues that "Even if the governing documents were made available to potential bidders, no potential bidder could possibly have counsel review and evaluate the governing

10

documents before the sale date." Memo at 24. But the form sale
agreement was made available on January 18, 2017 and the revised
version was made available on February 6, 2017, three weeks
before the sale, no prospective bidder has complained, and bids
are coming in.

Atlas points to the fact that a purchaser who intends to
assume the HUD insured loans on the apartment complexes must
deposit $8.25 million which is forfeited if HUD denies or fails
to approve the purchaser's application to assume the loans
within 96 days, and argues that "If the winning bidder intends
to assume the HUD Mortgage Loans, the winning bidder is very
likely to be unable to complete the sale and to be forced to
surrender the required $8.25 million deposit because HUD is
unlikely to approve or deny the bidder's application to take
ownership of the Holding Company within 96 days of the sale
date." Id.

Atlas supports this argument with a declaration of Steven
Ivankovich, an Atlas manager, that it took Atlas 24 months to
get HUD approval when it assumed the HUD insured loans on the
apartment complexes at issue. Ivankovich Decl. (Dkt. No. 22-1) ¶
6. But the HUD approval process a purchaser would go through is
not quite the same process that Atlas went through; it is more
quickly processed. Macquarie has indicated that it can extend
the 96 days if more time is needed for HUD approval. Transcript

11

of hearing Feb. 22, 2017, 27:11-17.

Also, a purchaser who intends to pay off the HUD insured loans on the apartment complexes must deposit $4.125 million, which will be forfeited if the loans are not paid off within 21 days. Atlas claims that "If the winning bidder intends to pay off the HUD Mortgage Loans, the winning bidder is very likely to be unable to complete the sale and to be forced to surrender the required $4.125 million deposit because it will not be possible to obtain financing and pay off the HUD Mortgage Loans and also close on the purchase of the Holding Company within 21 days of the sale date." Memo at 24. That pessimistic speculation does not render the sale terms commercially unreasonable: no prospective bidder has complained, for prospective purchasers can begin to secure financing before the sale date. With a while still to go to the bidding deadline, bids are already being received.

### Balance of Hardships

The balance of hardships decidedly favors Atlas because it faces the loss of assets it values in excess of $100 million, while Macquarie's loss is markedly less than $150,000 in expenses organizing and advertising the sale. The harm to Atlas, however, comes from business realities which do not present a fair ground for litigation, or for court intervention.

### Alternative Relief Sought

12

In the alternative, Atlas seeks to enjoin Macquarie from purchasing the collateral for itself.

Under N.Y. U.C.C. § 9-610(c), "A secured party may purchase collateral: (1) at a public disposition; or(2) at a private disposition only if the collateral is of a kind that is customarily sold on a recognized market or the subject of widely distributed standard price quotations." Atlas argues that because this sale does not fit within § 9-610(c)(2), Macquarie should be prohibited from purchasing Holdco because it claims the scheduled sale is not a "public disposition."

The Comment to § 9-610 states "a 'public disposition' is one at which the price is determined after the public has had a meaningful opportunity for competitive bidding. 'Meaningful opportunity' is meant to imply that some form of advertisement or public notice must precede the sale . . . and that the public must have access to the sale." Id., Comment 7. This sale has been advertised in the Real Estate Alert and is being advertised in the Wall Street Journal and information about the sale was shared with thousands of investors by CBRE and was made available by CBRE and Atlas on the online data site. At least 69 people have accessed the online data site.

Atlas's motion to enjoin Macquarie from purchasing the collateral is therefore denied.

## CONCLUSION

13

Atlas's motion for a preliminary injunction (Dkt. No. 5) is denied.

So ordered.

Dated:    New York, New York
          February 23, 2017

                              _Louis L. Stanton_
                              LOUIS L. STANTON
                              U.S.D.J.

14